UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DALI WIRELESS, INC., <br><br>　　　　　Plaintiff, <br><br>　　v. <br><br>CORNING OPTICAL COMMUNICATIONS LLC, <br><br>　　　　　Defendant. | Case No. 20-cv-06469-EMC <br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br>Docket No. 124 |

## I.　INTRODUCTION

Plaintiff Dali Wireless, Inc. ("Dali") filed this lawsuit against Defendant Corning Optical Communications LLC ("Corning") for patent infringement. There are three patents at issue: the '261 patent, the '358 patent, and the '454 patent. The Court **GRANTS** Corning's motion for judgment on the pleadings for reasons stated below.

## II.　FACTUAL & PROCEDURAL BACKGROUND

Dali initiated this lawsuit against Corning on December 30, 2019. In its original complaint, it asserted infringement of two different patents – *i.e.*, the '074 and '766 patents. *See* Docket No. 1 (Complaint). In its first amended complaint ("FAC") filed on April 30, 2020, Dali asserted infringement of three new patents currently at issue – *i.e.*, the '261, '358, and '454 patents.[1] *See* Docket No. 7 (FAC). Dali alleged that Corning has willfully infringed all three patents at issue because Corning had "extensively examined Dali's patent portfolio and proprietary technology" between 2010 and 2014, during which Corning became well aware of the nature and

---

[1] Dali also has another case against Corning in the Western District of Texas regarding a different patent that is still pending.

scope of Dali's extensive patent portfolio.

Corning moved to dismiss the FAC, arguing that Dali's allegations were insufficient to support a claim of willful infringement because none of the three patents were issued until after 2014 – thus, Corning had no knowledge of the patents at issue. *See* Docket No. 84 at 2. On August 19, 2021, the Court granted Corning's motion for judgment on the pleadings of no willfulness for failure to allege knowledge of the patents, with leave to amend. *See* Docket No. 96.

In its Second Amended Complaint ("SAC"), Dali now alleges that Corning had actual notice of the patents-in-suit prior to the filing of the FAC – *i.e.*, when the patents-at-suit were first alleged on April 30, 2020. According to Dali, Corning's in-house counsel learned of the '358 Patent on October 14, 2016, the '261 Patent on April 8, 2020, and the '454 Patent on April 15, 2020. *See* Docket No. 109 (SAC) at 8. Dali also alleges that Corning learned of the application of the '454 Patent as early as August 8, 2016. *Id.* at 10. Dali does not allege with any particularity how Corning learned of these patents. It does not allege, for instance, that Dali specifically warned Corning or presented infringement claims or contentions. According to Dali, Corning monitored its patent portfolio between 2010 and 2014 as follows:

- In late 2010, Corning executives were introduced to Dali. *Id.* at 8.
- In March 2011, Corning entered into an NDA to discuss purchasing radio distribution system components from Dali. *Id.*
- In October 2011, Corning executives visited Dali's research and development headquarters in Canada and discussed a framework for cooperating on a project. Corning also expressed interest in making a strategic investment in Dali. *Id.*
- In May 2012, Corning and Dali signed a letter of intent for Dali to develop, and Corning to purchase, portions of a radio distribution system. *Id.*
- Between May and July of 2012, Corning performed extensive due diligence on Dali's portfolio, and the two entered into a License and Purchase Agreement. *Id.* at 9.
- In September 2012, the two entered into a License and Purchase Agreement. *Id.*

2

- In April 2013, Dali and Corning discussed broader cooperation between the two companies.
- In October-November 2013, Corning informed Dali that it was reevaluating its business case relating to radio distribution system, but suggested that other projects and opportunities for collaboration with Dali would arise. *Id.*
- In March 2014, Corning reached out to Dali to discuss completing the radio project as well as beginning a new project. *Id.*
- On June 3, 2014, Corning's corporate development team met with Dali to discuss Corning acquiring Dali, during which Dali presented an overview of its strategy, product roadmap, and IP positioning. *Id.* Corning offered Dali up to $100 million for its business and IP holdings; however, it lost interest in acquiring Dali sometime between 2015 and 2016. *Id.* at 9-10.
- In 2017, Corning acquired SpiderCloud, obtaining the products accused of infringement in this lawsuit. *Id.*
- On information and belief, Corning continued to monitor Dali's patent portfolio, and the parties again discussed licensing Dali's portfolio in 2019. *Id.* at 10-11.

These allegations, however, are not specific to the '358, '261, or '454 Patents. From these facts, Dali alleges that Corning examined and continued to monitor Dali's patent portfolio, yet did nothing to ensure its products acquired as part of the 2017 SpiderCloud acquisition did not infringe Dali's patents until April 2020. *Id.* at 7, 10, 11. Dali further alleges that Corning continues to sell the accused SpiderCloud products. *Id.*

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "[T]he same standard of review applicable to a Rule 12(b) motion applies to its Rules 12(c) analog" because the motions are "functionally identical." *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Thus, when considering a Rule 12(c) motion, a district court "must accept the facts as pled by the nonmovant." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d

1047, 1053 (9th Cir. 2011*).* The district court then must apply the *Iqbal* standard to determine "whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief." *Id.* at 1054 & n.4 (citing *Iqbal*, 556 U.S. at 662).

A.  Willful Infringement – Elements

This Court recently addressed the elements of a claim for willful infringement:

> Section 284 of the Patent Act directs courts to award a prevailing claimant "damages adequate to compensate for the infringement" and "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The Supreme Court has held that while district courts should "take into account the particular circumstances of each case in deciding whether to award [enhanced] damages," "such punishment should generally be reserved for egregious cases typified by willful misconduct." *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1934 (2016). Enhanced damages, that is, "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," *i.e.*, behavior that is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or . . . characteristic of a pirate." *Id.* at 1932. "Since *Halo*, courts in this District have required willful infringement claims to show both knowledge of the . . . [p]atents and egregious' conduct in order to survive a motion to dismiss." *Google*, 2020 U.S. Dist. LEXIS 52753 (emphasis in original) (internal quotation omitted).

*Fortinet, Inc. v. Forescout Techs., Inc.*, No. 20-cv-03343-EMC, 2021 U.S. Dist. LEXIS 111314, at *58-59 (N.D. Cal. June 14, 2021).

The Federal Circuit has clarified that enhanced damages require a high standard of "wanton, malicious, and bad-faith behavior," but a finding of willfulness requires "deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys.*, Inc., 14 F.4th 1323, 1330 (Fed. Cir. 2021). This requires the patentee to show that "the accused infringer had a specific intent to infringe at the time of the challenged conduct." *BASF Plant Sci., LP, v. Commonwealth Sci. & Indus. Rsch. Organisation*, 28 F.4th 1247 (Fed. Cir. 2022). Further, "knowledge of the asserted patent and evidence of infringement" . . . "is necessary, but not sufficient, for a finding of willfulness." *Id.* (citation omitted).

Courts have since then noted that this finding of "subjective willfulness" can be satisfied by "proof that the accused infringer acted in the face of a *risk of infringement* that was 'either *known or so obvious that it should have been known* to the accused infringer,'" as articulated by

4

the Federal Circuit in *In re Seagate*, and discussed by the Supreme Court in *Halo*. *See Halo Elecs., Inc. v. Pulse Elecs.*, Inc., 579 U.S. 93, 101 (2016); *Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) ("*Halo* did not disturb the substantive standard for the second prong of Seagate, subjective willfulness."); *iFIT Inc. v. Peloton Interactive, Inc.*, No. CV 21-507-RGA, 2022 WL 609605, at *1 (D. Del. Jan. 28, 2022) (emphasis added) (citations omitted); *accord Fuma Int'l LLC v. R.J. Reynolds Vapor Co.*, No. 1:19-CV-260, 2021 WL 4820738, at *2 (M.D.N.C. Oct. 15, 2021)).

## IV.  DISCUSSION

As a preliminary matter, Dali points to an older Federal Circuit case, in which the court laid out factors for determining whether a defendant acted in such bad faith as to warrant an increase in damages. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992). However, while the *Read* factors are "useful guideposts in determining the egregiousness of the defendant's conduct[,]" they are not dispositive and a "district court is not required to discuss the *Read* factors." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382-83 (Fed. Cir. 2017); *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2016 WL 3880774, at *16 (N.D. Cal. July 18, 2016), *aff'd in part, rev'd in part on other grounds*, 879 F.3d 1299 (Fed. Cir. 2018). In the case at bar, the inquiry into willfulness is more direct and thus the multiple *Read* factors are less helpful.

A.  <u>Knowledge of the Patents</u>

Dali first sued Corning on December 30, 2019. Notably, Dali did *not* sue on the '261, '358, and '454 patents. Instead, they were first asserted in the FAC on April 30, 2020—*i.e.*, after Corning allegedly learned of the patents.[2]

First, to the extent Dali alleges Corning had knowledge of the patents by virtue of the prior discussion between Dali and Corning about Dali's portfolio, Dali's attempt to compare this case to

---

[2] According to Corning, it had no pre-suit knowledge of the patents because the SAC shows that Corning did not have actual notice of the '261 and '454 patents until April 8 and 15, 2020, which was after the filing of the original complaint in December 2019. *See* Docket No. 124 ("MJOP") at 4. However, the relevant complaint is the FAC, when the '261, '358, and '454 patents were first asserted. *See Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, No. CV 19-1334-RGA-CJB, 2021 WL 2036671, at *8, n.12 (D. Del. May 20, 2021).

*Finjan* is unpersuasive. In *Finjan I*, the plaintiff's FAC was dismissed because the plaintiff did not allege direct knowledge of the patents but rather only the collaboration among the parties and general knowledge of Finjan's patent portfolio. *Finjan, Inc. v. Cisco Systems*, No. 17-cv-00072-BLF, 2017 U.S. Dist. LEXIS 87657, at *12 (N.D. Cal. June 7, 2017) ("*Finjan I*") ("[T]he FAC never ties this general knowledge of Finjan's patent portfolio to the [a]sserted patents."). In *Finjan II*, the court found that the plaintiff's SAC plausibly alleged pre-suit knowledge when the plaintiff alleged that the defendant issued its Annual Report and Quarterly Report, which identified all of the asserted patents at issue and described the issue date, expiration date, and subject matter of the asserted patents, for its investors. *Finjan, Inc. v. Cisco Sys., Inc.*, No. 17-CV-00072-BLF, 2018 WL 7131650, at *6 (N.D. Cal. Feb. 6, 2018) ("*Finjan II*"). Here, Dali does not allege that it identified the specific patents during its discussions with Corning. Therefore, the facts as alleged in the SAC are closer to *Finjan I* than *Finjan II*.

Dali next alleges that there was actual notice of the patents. But this actual notice would at most constitute notice of the actual patents, not of infringement, for a mere 22 and 15 days; Dali fails to establish notice of *infringement*. *Cf. Sapphire Crossing LLC v. Robinhood Mkts.*, No. 181717-MNCJBCONSOLIDA, 2021 WL 149023, at *6 (D. Del. Jan. 15, 2021) (granting motion to dismiss willfulness allegations where plaintiff provided notice of the patent 15 hours before filing Complaint and describing it "as the most *de minimis* claim of willful infringement in this Court's history).

B.  Egregious Conduct

Even if Corning had sufficient notice of the patents, Dali fails to establish egregious conduct. According to Dali, Corning's conduct is egregious because—despite the parties' knowledge—(1) they did "nothing to ensure that the products acquired as part of the SpiderCloud acquisition did not infringe Dali's patents," (2) remained "willfully blind as to whether it infringed the patents-in-suit," and (3) "continue[d] to sell the accused SpiderCloud products that infringe Dali's patents without authorization." Opp'n at 12.

Dali's first theory fails as it imposes an affirmative duty on Corning to ensure that its products did not infringe its products, a standard that was expressly overruled by the Federal

6

Circuit. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1368, 1371 (Fed. Cir. 2007), *abrogated on other grounds by Halo Elecs.*, 579 U.S. 93 (2016) ("[W]e abandon the affirmative duty of due care [to determine whether or not he is infringing], [and therefore] we also reemphasize that there is no affirmative obligation to obtain opinion of counsel."); 35 U.S.C. § 298 ("[F]ailure to obtain advice of counsel or getting it but not offering it in evidence, before embarking on infringing activity do not constitute evidence of willfulness of the infringement (direct or contributory or of inducement to infringe)."). However, that is not to say that one can ignore a risk of infringement "so obvious that it should have been known to the accused infringer." *WesternGeco LLC v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016), *rev'd on other grounds*, 138 S. Ct. 2129 (2018)).

Thus, the key to this case is whether Corning acted in the face of infringement that was "either known or so obvious that it [the infringement] should have been known" to Corning. *See id.*

In discussing its willful blindness theory, Dali cites several cases in which courts found that the defendant was willfully blind to a "high risk that it was infringing" the plaintiff's patents or constituted a risk of infringement "either known or so obvious that it should have been known." *See* Opp'n at 13-14, 17 n.7 (citing *Corephotonics, Ltd. v. Apple, Inc.*, No. 17-CV-06457-LHK, 2018 WL 4772340, at *9 (N.D. Cal. Oct. 1, 2018); *MasterObjects, Inc. v. Amazon.com, Inc.*, No. C 20-08103 WHA, 2021 WL 4685306, at *6 (N.D. Cal. Oct. 7, 2021)). According to the Supreme Court, "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Since *Glob.-Tech* and *Halo*, "courts have recognized that allegations of willful blindness can satisfy th[is] knowledge requirement for willful infringement." *Corephotonics*, 2018 WL 4772340, at *9. An inference of "willful[] blind[ness] to a high risk" of infringement is sufficient to satisfy this requirement. No such obvious risk has been alleged here. Cases cited by Dali are inapposite.

For example, in *Corephotonics*, the plaintiffs gave the defendant files describing its pending patent applications and patent plans, including those related to the asserted patents. *Id.* At a meeting, the defendant's negotiator also told the plaintiff that "even if [the defendant]

7

infringed [the plaintiff's patents], it would take years and millions of dollars in litigation before the [defendant] might have to pay something." *Id.* Then, after the defendant released one of the allegedly infringing product, it asked the plaintiff not to send any of its patents. *Id.* From these facts, the *Corephotonics* court found it plausible to infer that the defendant's message to the plaintiff not to send its patents was a deliberate action to avoid confirming a high risk that it was infringing the asserted patents that had then been issued. *Id.* From these facts, the court found that it was plausible to infer that the defendant's message not to send its patents was a deliberate action to avoid confirming a high risk that it was infringing the patents, and that the defendant knew of at least a high risk that it was infringing the plaintiff's patents upon the plaintiffs' notice of infringement. *Id.* Therefore, the plaintiff had sufficiently shown that the defendant "continued to act even though it knew that it was infringing [the plaintiff's] patents or that the risk of such infringement was obvious." *Id.* at *7 (citing *Arctic Cat*, 876 F.3d at 1371).

In *Straight Path IP Group*, the defendants had prior knowledge of both the patents and the alleged infringement because the plaintiff had sued them two years prior.[3] *Straight Path IP Group., Inc. v. Apple Inc.*, No. C 16-03582 WHA, 2017 WL 3967864, at *4 (N.D. Cal. Sept. 9, 2017). In *Baxalta Inc. v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 461 (D. Del. 2021), defendants launched the allegedly infringing product while on notice of the patents as part of the litigation, without an attempt to design around the patents, this constituted a risk of infringement "either known or so obvious that it should have been known." *See also Velocity Patent LLC v. FCA US LLC*, 319 F. Supp. 3d 950, 971-72 (N.D. Ill. 2018) (finding that evidence of continued infringement without any effort to ensure it was not infringing despite being sued 2013, including the failure to start collecting the relevant source code until 2017, and expansion of infringing activities without implementing the allegedly non-infringing alternatives available that were easy

---

[3] Dali also argues that, even where pre-suit willfulness was insufficiently pled, courts may still allow post-suit willfulness claims to proceed. *Id.* at 18 (citing *MasterObjects*, *Inc.*, 2021 WL 4685306, at *6 (finding that allegations defendant's post-litigation misconduct including evasive discovery practices made it "reasonable to infer that [defendant's] infringement is intentional"); *Fluidigm Corp. v. IONpath, Inc.*, C 19-05639 WHA, 2020 U.S. Dist. LEXIS 12154 at*15-16 (N.D. Cal. Jan. 24, 2020) (ruling that patent owners "may move for leave to amend" should "evidence of egregious conduct come to light, post-filing")). However, no post-suit willfulness allegations were pled in the SAC.

to implement, could support a finding of willfulness).

In *Finjan II*, the plaintiff alleged that the defendant had continuously invested in the plaintiff since 2004 and learned about the plaintiff's technology. *Finjan II*, 2018 WL 7131650, at *7. The defendant and the plaintiff had been in a long and extensive collaborative working relationship for almost twenty years. During this time, the defendant gained knowledge of each of the patents-in-suit from at least as early as 2004 until 2014 and even attended multiple of the plaintiff's board meetings discussing patents, technology, and business strategies. *Id.* at *2. *Finjan II* contrasted its facts from that in *Cont'l Cirs. LLC v. Intel Corp.*, No. CV16-2026 PHX DGC, 2017 WL 679116, at *11 (D. Ariz. Feb. 21, 2017). In *Cont'l Circuits*, despite a long standing relationship between the parties, no notice of infringement could be inferred. The *Finjan II* court explained:

> In *Cont'l Circuits*, . . . [the plaintiff alleged that] [a]round 1996 to 1998 the plaintiff and Intel held meetings to discuss "design rules and manufacturing reliability of printed circuit boards." Intel and the plaintiff "coordinated together on [the latter's] Photolink, a product which came to embody the patented inventions." Around 1997, one of the plaintiff's employee shared with Ibiden the technology which was later described in the patents-in-suit. Ibiden was a supplier to Intel. In 2005, the former entity contacted Intel about licensing a continuation application. Intel decided "not to pursue" the licensing. The continuation application later led to the issuance of the four patents-in-suit, which were granted in 2009, 2012, 2013, and 2016, respectively.
> . . .
> The court also held that the case involved a pending continuation application but no allegations of pre-suit accusations of infringement, and thus distinguished other cases where willfulness was sufficiently pled. Finally, the court concluded that "the allegations concerning 'the pre-suit relationship between the parties' did not create a reasonable inference" that the defendants' conduct went beyond those "in a typical infringement case."
>
> . . .
>
> Considering the circumstances, the Court finds that the situation here is distinguishable from *Cont'l Circuits*. In that case, the plaintiff and Intel interacted with each other to collaborate for a short period of time. Also, Intel did not actively seek the plaintiff's technology. In fact, Intel was contacted once about licensing the plaintiff's continuation application but expressed no interest in doing so. By contrast, Cisco allegedly formed an investment relationship with Finjan that lasted many years. The SAC contains factual allegations from which it can be inferred that Cisco valued Finjan's technology and actively learned about the technology, for example,

> by sending a representative to Finjan's board meetings and attending a presentation. Cisco also received on multiple occasions information about Finjan's patents, including the Asserted Patents, over the course of the parties' investment relationship.

*Finjan II*, 2018 WL 7131650, at *7 (citations omitted).

Dali argues that it and Corning had a long history from 2010 to 2014, participating in numerous meetings, during which Corning representatives met with Dali and learned about Dali's products and technology. Opp'n at 17. However, the allegations of the SAC falls short. It alleges that Corning executives were introduced to Dali in late 2010, the parties entered into an NDA in March 2011, Corning expressed interest in making a strategic investment in Dali in October 2011, and the parties signed a letter of intent to purchase portions of a radio distribution system in May 2012. SAC at 8-9. Corning performed due diligence between May and July 2012. *Id.* Thereafter, Corning informed Dali that it was reevaluating its business with Dali in 2013. *Id.* at 9. It was only in June 2014 that Corning's corporate development team met with Dali to discuss Corning acquiring Dali and presented an overview of the company's strategy, product roadmap, and IP positioning with additional diligence on July 3, 2014. *Id.*

While Dali and Corning discussed a possible acquisition, there are no facts in the SAC that suggests that Corning conducted IP due diligence which included the three patents at issue. No other allegations establish an obvious risk of infringement. In fact, Dali's argument that infringement should have been obvious is belied by the fact that its own initial complaint did not allege infringement of the three patents at issue.

Accordingly, Dali fails to adequately allege willfulness.

## V. DISMISSAL WITHOUT LEAVE

Although Dali's SAC is insufficient, Dali's opposition includes facts that Dali obtained through discovery. Opp'n at 5 ("At the time Dali filed the SAC, [Dali] had yet to take the depositions of Corning's witnesses."). According to Dali, subsequent depositions revealed that Corning failed to follow reasonable procedures to determine whether it infringed the patents-in-suit. *Id.*

For example, Dali states that the deposition of Mr. Montgomery, the Senior Managing Counsel for Corning, confirmed that he had pre-suit knowledge of the patents in 2016 and 2020,

yet did not inform anyone at Corning of the patents. *Id.* at 6-7. He testified that he disregarded these patents based solely on his review of the patent's titles, which included DAS, but not small cell. *Id.* at 7-8. Dali argues that this supports its willful blindness theory because the DAS and small cell are related and overlap and that Mr. Montgomery's position contradicts Corning's and Mr. Montgomery's own practice, as Mr. Montgomery helped prosecute a patent that viewed small cells as a type of DAS. *Id.* at 8 (quoting U.S. Patent No. 9,800,340 ("[a] small cell is a small size radio node with a digital backhaul. Non-limiting examples include . . . digital DAS and remote radio heads . . . and other radio nodes for specific applications")). Dali also argues that Mr. Montgomery refused to testify about the circumstances of the patent searches that led to that knowledge and admitted that he failed to discuss the patents with decision-makers. *Id.* at 8.

According to Dali, it should have been obvious to Mr. Montgomery that Corning's product was infringing because of the narrowness of the patented field and technology. While the SAC does not support this contention and fails to establish willfulness for the reasons stated above, the Court cannot say at this juncture that further amendments would be futile. It cannot say with certainty that the standard of obvious infringement cannot be stated.

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Corning's motion with leave to amend. The Third Amended Complaint is due within thirty (30) days from the date of this order.

This order disposes of Docket No. 124.

**IT IS SO ORDERED**.

Dated: May 5, 2022

EDWARD M. CHEN
United States District Judge